20-8048. Council, you may proceed. Mr. Nicholas. Thank you, Your Honor. My name is Phil Nicholas. I practice in Laramie, Wyoming. I'm a pleasant of the court. Council, we represent a family ranch that's called Whiteford Enterprises, Inc. They've been ranching for several generations up in the Goshen County area next to Glendale, Wyoming. We are asking you to reverse the decision of the district court. What I'd like to do in my presentation is principally go through Judge Friedenthal's decision and suggest to you the primary reason why the case should because she misconstrued or I think maybe intentionally construed facts narrowly in order to reach a result that we think was unfair and wrong. I think it's important to understand some facts. I hope you by maybe already know these things. But procedurally, what happened is that we had filed this complaint in a bankruptcy case involving the Twifers as an adversary proceeding. The defendants, Rowan Hills Bank, filed a motion to dismiss in the bankruptcy case and then also applied to the court to revoke its reference to the case. And that's what happened. Judge Friedenthal did revoke the reference and brought the case to the district court. When the case arrives in the United States District Court, there's been no answer filed. The case is not at issue and all that is filed is a motion to dismiss. The motion to dismiss contained loan documents and the judge then sua sponte converted the case from a motion to dismiss to the summary judgment and gave the plaintiffs ourselves 10 days to respond and to supplement the record because the case was now one of a summary judgment. We counsel did you respond? What did you respond with like a 56 F affidavit saying you needed time and discovery? Yes, Your Honor, we did. And actually, the conversion occurred, we actually asked for more time and what the judge gave us was 10 days. Okay, so using I'm sorry, I'm just it. Is this a basis in your briefing for appeal? I mean, it seems your appeal has has taken this case on on the merits and not on this procedural issue you're talking about. Your Honor, the I think that's a fair statement, we had a decision to make, we have a limitation of briefing. And because the judge really did rely on the loan documents without really looking at the affidavits and file, we determined that we spent our time briefing the merits as to why the judgment. But I do think it's important for you to recognize what parts of the record could not be developed. And we're not developed because it does influence the argument that we're making today. Presently, the one let me let me ask you one more threshold question. And then I'll quit interrupting you. Do you do you agree that if Nebraska, or I think this is Nebraska law that or Iowa, I'm sorry, Midwest, that if Iowa law applies that that you lose? No. Okay. I mean, just to jump forward on that, Judge Friedenthal concluded in the one area where we agree that she characterized the facts correctly was the when she addressed the issue of whether or not the statute of limitations fraud statute of frauds for credit claims in Iowa applied to our claims based upon duty of good faith and fair dealing. In that one argument, she properly characterized our argument said she thinks that our claims would survive. Then she moved on, of course, and dismissed the case based upon the releases that were signed, Your Honor. Thank you. Okay. All right. Fair enough. And that releases argument really has to be an analyze. I think it doesn't make any difference which whether it's Iowa or Wyoming, they're substantially the same in that regard, Your Honor. Okay, fair enough. I think that helps you. I hope it does. Can I just ask a slightly different question, but I've been curious about this. Leaving aside the release language, choice of law language, all of that, why don't the clauses in the loan contracts stating that only the written terms are enforceable bar your claims? Because the claims that we are client, the basis of our claim is a claim based in the duty of good faith, the fair dealing that rose independent of the contract. Okay. And under Wyoming law, and actually the same is true in Iowa law, you're entitled to, and the court recognizes claims of duty, good faith and fair dealing, so long as they rise outside the terms of the contract. And Your Honor, that goes right to the center of why we think the judge has mischaracterized the claims in order to reach. Just to be clear, you brought five claims, not just the breach of implied covenant of good faith and fair dealing. You have breach of contract, negligence, fraud, negligent misrepresentation, and you only have mentioned the good faith. Is that what it comes down to at this point? No, Your Honor. And for the same reason as all arguments apply. So now I got to back up to the beginning to talk about why the judge's claims in all respect or analysis was incorrect. Real estate lending is a special field and it's always been a special field, particularly for ranching and real estate, where you have ranchers who are having to come in and borrow money for cattle operations that go on a year to year and short term loan basis. And on the other hand, they have family real estate that they have financed on a long term basis. And for as long as I practice in my lifetime, real estate agricultural lending is a special field. Our Wyoming Supreme Court recognizes that. If you look at Burt versus Wells Fargo home mortgage that we've cited to, the court talks about agricultural being a specialized field of lending. So what happens in this case and the center of what is the criticism here is, is that Rolling Hills Bank, fair enough, takes on the cattle loan of the Twyfers. No problem there. They're entitled to do that. And they create a carrot to them to say, by the way, we would like you to take on your real estate loan, which would be a long term loan as well. Twyfers say probably not interested in doing that, but thank you for the invitation in order to create an inducement and a carrot at the time of refinancing, taking on the cattle loans, the bank adds into the loan, the cost for the loan origination fee for the entire real estate loan should Twyfers elect to do it. And should the bank elect to do it? At this point, the parties begin a loan relationship, which is a very important to your analysis. And that is the parties are now in a customer bank relationship in a specialized field of cattle industry in Wyoming. And they move along. There are a couple of hiccups. The issue in this case becomes when the bank goes to the Twyfers and said, we would like now to take on your real estate loan. We submit to you that at that time, the bank had already determined it had no interest in being a lender to the Twyfers. The bank's sole interest at taking on the real estate loan was to over collateralize itself in order in anticipation that they were going to foreclose. We submit to you than the specialized field of ranch real estate financing that essentially that conduct and inducing them to come in and bring and take on a new loan to get collateral to become over securitized on their entire loan to protect any deficiency they might have on the cattle loans. That is a special as an independent tort. They have a duty. Part of this is arises out of the fact that they are in an existing loan relationship. It would be different if you went to a brand new lender, apart from somebody have a relationship and said, here's my loan application and they evaluate it. In this case, there's an existing loan relationship. Rolling Hill Banks misrepresents to the client that their interest is to take on a ranch real estate with a five-year loan and that they were prepared to continue the relationship. Let me interject briefly. Apologize. On the issue with release, why isn't that an independent impediment to all of the claims, including the breach of the unified covenant of good faith and fair dealing when the 2016 release was contemporaneous, not only with the family getting additional time, but they also got in excess of $800,000 in new loan proceeds. The only rejoinder that I saw on, I think it was page five of your reply brief was, well, that was just them feeding and taking care of their own collateral, which I guess you could say of any bank, providing funding for a tenant or for a mortgagee, providing utilities is only preserving their collateral. Well, they were getting the benefit of that $800,000 because they were able to fund their operations. Why wasn't that at least a ratification of the modification which contained the release? Your honor, it's a good question. I'd like to if you go back to the inception of what we considered as the improper conduct, and that is where the bank reaches out to induce the borrower to bring a special real estate property and give them a real estate, a five-year note, knowing that their only intention is to collect all the collateral, including the cattle and the ranch, create cross collateralizations with the intention that they're going to foreclose. This is, in fact, the game plan. The game plan is that once we have these assets, we can now control the debtor, and we have control over everything you do. You can't spend money. You can't do anything. They exercise that domination of control by when they get to the point of saying, all right, you're now shut down. By the way, we have five or six loans out there. We take loan one, and loan one now is default. Because everything is cross collateralized, they're all in default, including your long-term real estate loan that we induced you to bring in. Let me interrupt here. Saying that's true, giving you that, saying that's all true, you had the opportunity at that time, your client could have filed for bankruptcy at that time and sought protection in the courts and potentially brought all these same claims at that time. Instead, your client chose, perhaps wisely so, I don't know what the situation was, to negotiate with the bank, get an additional 18 months and the money to keep the cattle alive. Why isn't that? That's everybody who's in trouble on a bank note in that situation. What makes the case different than everybody on a bank loan is how you arrived there. Because when the game plan is to fraudulently induce you or to misrepresent facts in order to get the collateral over the ranch, the bank then has inoculated itself from bankruptcy. Because for the proper planning, what Twyford has done and what other ranchers do, is that if you have a real estate loan that's current, and you have cattle that are a loan that's not current, you could sell your cattle, start over and start a cattle herd. You can go out and lease your ranch, you have all these options. Once the bank secures the real estate loan, and then takes your real estate loan and puts it in default, you now have one secure creditor that controls and dominates your action and bankruptcy. In order, what I would describe as medicated. Even if it was egregious what the bank did, why isn't it still an enforceable release? Because you've ratified the contract by accepting the additional time, accepting the egregiousness of the bank pertinent to the enforceability of the release. Your Honor, because in the case law, when you take a look at your remedies and defenses to the enforcement of the contract, including those of a release, the defense is if you are compelled to do it based upon duress. And one of the things to address is adverse domination by the other induced you to bring a note, a long-term note on a special piece of real estate where your home is, knowing that their real intent was not to become your banker. Their intent at the time was to become the foreclosing entity. At that point, they actually exercise domination over your entire property. They determine what, in other words, I see my time has expired. Why don't you go ahead and finish your thought. All right. So thank you very much, Your Honor. And I obviously I've got a lot of passion on this, but once they exercise the domination, then what they get to do is say, you can't use any of your cattle sales proceeds to do anything, including pay your loan on your real estate. And so then what they do, and this is the plan, this is how these things work in ag lending, is they say, we'll give you enough money where you have to sell some of your cattle and pay some of your bills and keep you hanging on the lifeline. And the time that they asked for was to mitigate to see if they could get another financing firm to come through. And they didn't partly because the bank, as our affidavits show, kept their loans in a default position that would not have happened as they had their real estate separate. And they would have been able to keep their real estate loans. They might have lost their cattle, but they'd still have their ranch. And that's what makes the ranching special. That's why the specialized relationships exist. And that's why we're here. Thank you, Your Honor. Thank you, Counsel. Ms. Salisbury. Thank you, Your Honors. May it please the court. My name is Jennifer Salisbury and I represent the appellee in this case, Rolling Hills Bank and Trust. Your Honor, the district courts granted judgment on the bank's behalf and she did so after providing the appellants with every opportunity to make their case. And Your Honors, you may affirm the district court's opinion on multiple, multiple grounds. But I believe the simplest, cleanest, and easiest reason to affirm the district court's opinion is based upon the releases. To hold the parties to the terms of the multiple contracts that were signed by Twyford Enterprises and the guarantors. Can you then address on the releases? Why isn't there a genuine issue of fact regarding economic duress? Um, Your Honor, there are three reasons why there is not a genuine issue of material fact regarding the releases. The first is that there has to be an allegation in the record that the bank did something improperly. And I will, and that improper act has to be tied to the releases. And I'd like to emphasize to Your Honor that Twyford Enterprise signed four agreements that had waivers in them in May of 2016, whereby Twyford Enterprises waived any claims it may have against the bank as to the underlying obligations. And there's no allegation, there's nothing in the record that says there's any bad act that occurred by the bank in May of 2016. Then there's the first modification agreement that was entered in June 2016, approximately 45 days later. There are no facts in the record that the bank did any coercive bad act at that time to cause the Twyford Enterprises and the guarantors to sign that the Twyford Enterprises and the guarantors signed another modification agreement, which came contained another release. And there is no evidence, there's no assertion of any bad act that occurred in 2017. That's the first reason, there's no bad act. The second reason why economic duress does not apply here today is that the appellants have to show and they had to show the trial court that they were completely deprived of their free will. That's Wyoming law, that's essentially Iowa law too. And the appellants had many, many alternate paths they could have taken other than signing these releases. First in March of 2016, I mean May of 2016, then in June of 2016, and then subsequently in 2017. They could have sold their property and paid off the loan. They could have attempted to refinance the indebtedness. They could have borrowed money from someone else to pay off the loan. They could have filed bankruptcy. They could have sued the bank at that time as opposed to signing Twyford Enterprises six separate documents releasing these claims and the guarantor signing two separate documents releasing these claims. And then also, your honors, hit it on the head with your questions to Mr. Nichols. Twyford Enterprises and the guarantors accepted the benefits under the agreements. They accepted the $850,000 of additional funds to continue operating and they accepted the time. They accepted the additional 18 months that the bank provided them for them to determine a way a commercial way out to repay the indebtedness. I'd like to emphasize, your honors, that the appellants never claim that the bank didn't lend them approximately $5 million. They don't claim they don't owe the money to the bank. Again, Iowa law is very, very clear. Any party who is entitled to avoid a contract on the ground of after the duress has been removed. Silence and acquiescence for a period of time amounts to ratification and an alleged victim of duress may not obtain part of the benefits of an agreement and disavow the rest. Ms. Salisbury, let me ask you about... Yes, sir. You have a lot of good arguments on the last one. How do you respond to Mr. Spahn? Now, they had collateralized all of their calves, their cows, their land, and it was structured that they couldn't even repay their notes because of the way that the payments were applied. In 2016, with these modification agreements, when they got this $850,000, it's as if they were... These are not Mr. Nicholas's words, but the way I visualize it is they have basically an economic gun to their head and saying, okay, well, we'll give you more money, we'll give you more time, and they really have no realistic option. They really don't have any free will. They're going to lose their land. They're going to lose everything. Bankruptcy won't help because now the bank is secured with everything that they have, their cattle, their land, and so they were still under economic duress even though they accepted the $850,000 in the initial time. Your Honor, that would be true in every single commercial loan to the extent that any bank or any lender is seeking to collect on a defaulted loan. It is not disputed that the bank sent a notice of default, I believe it's part of the record, in which in March of 2016, the debtor, Twyford Enterprises, was behind on its payments on all five of the loans. All five of the loans were passed due, not just one, not just two. All five of the loans were passed due at the time that those first four modification agreements were entered into, and at the time that the subsequent modification agreements were entered into. This is a commercial loan. The Twyford Enterprises borrowed over $5 million from the bank, and those funds were collateralized by the cattle and by the real estate. The loan went into default. The bank, as was its right to do so, attempted to reach a time for all parties to work out a resolution of the issues between them. If simply the fact that the loan is in default is enough to assert a claim of economic duress, again, couldn't go in default. I mean... So how would going into default have been a reasonable alternative to them? If they had just gone into default or filed bankruptcy, then wouldn't it be clear that the bank then would get all of their operations, all of their land? They'd have nothing. Only if they weren't able to pay back the loan. And they were not able to pay back the loan. The question is not, you mentioned that this is true of every situation where a debtor is underwater. That's true, but in not every case is there an issue about the enforceability of a release. And on summary judgment, I'm just a little concerned that viewing the evidence to the light most favorable to the Twyfords, that it might be a genuine issue of material fact of they remained under economic duress when they accepted the $850,000 additional operational loans and the additional time. But your honor, economic duress needs to be premised on a bad, unlawful, coercive act by the bank that occurred at the time the borrowers entered into the bank. If they had fraudulently induced the cross-collateralization of their land, say in 2014, and created a situation of dire economic duress for the Twyfords in 2015 and 2016, and then the bank comes in and says, we'll give you a release, give us a release and we'll loan you more money, won't probably help you, but it'll be a temporary lifeline. You're saying that you can't claim economic duress because the wrongful act preceded the conveyance of the release. Is there a case that says that? I believe that the case law ties the bad act that must be agreement and you simply can't rely upon circumstances that existed prior to that time. I think the bad act must be tied to something that was done in connection with the contracts. And again, there is no dispute that the Twyford Enterprises and the guarantors did not accept the benefit of over $5 million loan to them from the bank. And if at the end of the day, the collateral didn't support that loan, that is not economic duress caused by the bank. That's just the loan to value. I mean, as Mr. Nichols said, he says it's a bad act that the bank wanted to secure a higher collateral value for its loans. Again, that's not a bad act. That's good banking. All lenders want a higher collateral value to their loans. And so kind of circling back around your honors, I think it's very important to look at the record very, very, very carefully. And we made this point in our briefs, because again, I believe the circuit can affirm the district court's opinions on many, many, many different grounds. Again, the releases being the easiest. But another basis for affirmance would be looking at the complaint very, very carefully and determining whether or not the appellants actually have asserted a factual basis for fraudulent inducement. And I would say your honors that they have not. But if you look carefully at the record, not at the statements of counsel, not at the briefing, but the actual record, and you dig into the affidavits, there is not even a cognizable claim for fraud that would support denial of the court's entry of judgment on summary judgment. But again, it's our position. You don't need to get there. The releases were entered into between the bank and the appellants. The bank provided time. Forbearance alone is sufficient consideration to uphold a release. The bank provided time. They provided money. And the loans are in default. And the bank relied upon its contractual rights to ultimately try to collect the money that was owed to it. Counsel, other than your argument based on the releases, what would be an alternative ground as to the good faith and fair dealing claim? Well, your honor, good faith and fair dealing doesn't just appear out of nowhere. Good faith and fair dealing, whether you look at Iowa law or Wyoming law, needs to be tied to a specific provision in the contract, which provides the parties with some sort of discretion as to how the parties would operate under that. What is conspicuously absent from every single pleading provided by the appellants is any attempt to grapple with the actual language of the contracts. With respect to the covenant of good faith and fair dealing, they don't identify any provision, any written provision in any of the agreements that would support their allegation that somehow the bank had an obligation to continue lending money to the appellants even past the maturity date, even past default. It's simply just not there. I don't believe they have asserted a covenant of good faith and fair dealing under Iowa or Wyoming law because they don't point to provision of the contract where there's an implied duty there under in order to comply with the explicit provision in the contract. They simply say by failing to continue to loan us money, you breached the covenant and that's not sufficient, your honor. Thank you. Thank you. Other questions? Thank you, counsel. We appreciate your arguments this morning. Case will be submitted and counsel are excused.